**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 19-4019

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY LAMONT CALDWELL,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:17−cr−00040−MOC−DSC−1)

Argued:  May 5, 2021            Decided:  August 3, 2021

Before NIEMEYER, WYNN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

**ARGUED:**  Chiege Ojugo Kalu Okwara, Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WYNN, Circuit Judge:

Anthony Caldwell appeals from his conviction after a jury trial for charges related to bank robbery and firearm possession. He raises numerous challenges to his convictions, including to the district court's denial of his motion to suppress and to various evidentiary rulings. We affirm.

I.

On the evening of December 9, 2016, two young men wearing dark clothing, masks, and gloves entered a Wells Fargo bank in Charlotte, North Carolina. Each was armed with a revolver. They stole nearly $5,800 in cash from the bank's tellers before fleeing in a car. The pair were later identified as Michael Cole and Rahshie Mitchell, both of whom were minors at the time. Unbeknownst to them, two GPS tracking devices were embedded in the stolen cash.

Two officers tracked the GPS signal to an address within a couple miles of the bank, where they stopped and exited their vehicle. One of the officers heard rustling in the woods and, turning to look, witnessed three individuals running away. The officers began to pursue, but for safety reasons decided to call in backup, including K-9 and helicopter units. Those additional units arrived within minutes, and the K-9 handler announced that a search with the dog would commence. The police presence was not subtle: between their flashlights, the blue lights and spotlights on their cars, the helicopter above, and the sounds of communications between the officers on site and over the radio, it would have been clear to anyone in the area that the police were there and were engaged in a manhunt.

2

Nevertheless, Caldwell remained hidden, shielding himself amid vines and weeds along a fence. One officer "walked right past" Caldwell in the brush, only noticing him when the police dog alerted to his presence. J.A. 1252.[1] The K-9 unit ultimately apprehended Caldwell, with the dog biting his arm in the process. A black bag containing nearly all of the missing cash as well as one of the GPS trackers was found underneath Caldwell.

Caldwell told the police he had been carjacked by two men while sitting in a Chevrolet Impala near the Wells Fargo. At trial, he testified that the carjackers had pistol-whipped him several times and forced him to flee with them; that he passed out from being hit in the head; and that he only woke up when the police dog bit him.

The officers were not convinced by Caldwell's story and arrested him. They continued the search, but were unsuccessful in locating Cole and Mitchell. Arrest warrants were eventually issued for the two teenagers after DNA evidence linked each of them to the robbery.

Shortly after arresting Caldwell, officers found the Impala nearby. In plain view in the back seat were a black jacket, a North Carolina license plate, and a black revolver. The car's rear sported an invalid temporary license plate.[2] Officers located a black hooded sweatshirt and glove along the fence, as well as a ski mask on the ground next to the vehicle. They also found "two loose $20 bills of U.S. currency, a cash wrapper that would go around

_____

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] Only rear, not front, license plates are required in North Carolina.

3

a stack of bills, and [the other GPS] cash tracker" in the front yard of the address where the suspects had fled. J.A. 1280.

The officers sealed the vehicle at the scene before towing it to the law enforcement center, where they searched it after obtaining a warrant. A search of the passenger compartment revealed a "large black jacket, the black Rohm revolver, [a] black ski mask, [a] black toboggan, [and] black gloves." J.A. 1314. However, officers did not search the vehicle's trunk because the car battery was dead, rendering the trunk-opening mechanism inoperable.

After the initial search, police moved the vehicle to an impound lot. Nearly two weeks later, on December 22, detectives jump-started the car's battery and opened the trunk. The trunk contained a silver revolver, black gloves, and a black skullcap.

On November 14, 2017, a federal grand jury returned a four-count superseding indictment charging Caldwell with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 2113(a) and (d) (Count I); bank robbery, in violation of 18 U.S.C. §§ 2 and 2113(a) and (d) (Count II); possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c) (Count III); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count IV). Caldwell pleaded not guilty and requested a jury trial.

Caldwell filed a motion to suppress all the evidence found in his vehicle, alleging that the searches violated his constitutional rights under the Fourth Amendment. After conducting a hearing, the district court denied the motion, and a jury trial commenced in

January 2018. After deliberating, the jurors reported a split vote, leading the district court to declare a mistrial.

The case was retried. During the second trial, Cole and Mitchell each testified that they had known Caldwell before the robbery and that he had recruited them to commit the crime, including providing weapons and details about the bank. They also testified that Caldwell served as the getaway driver. Caldwell testified on his own behalf, claiming that he had not previously known Cole and Mitchell and repeating his story that they carjacked and pistol-whipped him.

The jury returned a guilty verdict on all four Counts. As to Count III, possession of a firearm in furtherance of a crime of violence, the jury found that Caldwell (or others aided and abetted by him) brandished the firearm.

The district court sentenced Caldwell to 284 months imprisonment: 60 months on Count I and 200 months on Counts II and IV, all to be served concurrently, followed by 84 months on Count III, to be served consecutively. Caldwell timely filed a notice of appeal.

## II.

Caldwell raises numerous challenges to the district court's handling of his motions before, during, and after trial, as well as to its evidentiary rulings and trial-management decisions. Further, for the first time in his reply brief, Caldwell argues that two recent Supreme Court decisions require us to vacate his firearm convictions. We find none of his arguments persuasive and therefore affirm.

A.

We begin with Caldwell's challenge to the district court's denial of his motion to suppress. In evaluating this claim, we review legal conclusions de novo and factual findings for clear error and construe all evidence in the light most favorable to the government. *United States v. Vaughan*, 700 F.3d 705, 709 (4th Cir. 2012).

Caldwell alleges that both searches of the vehicle were illegal: the December 9 search because the police neglected to follow proper warrant procedures, and the December 22 search of the trunk because the warrant was no longer valid and no exigent circumstances applied.[3] The district court concluded that under the automobile exception, a warrantless search of the vehicle "as it sat in the woods on the night of [the] robbery" would have been justified, and that the police also could have conducted an inventory search of the vehicle at the police station or after the car was impounded. *United States v. Caldwell*, No. 3:17-cr-00040-MOC-DSC, 2018 WL 491782, at \*2 (W.D.N.C. Jan. 19, 2018). We conclude that the automobile exception justified both searches.[4]

Under the Fourth Amendment, law enforcement officers are generally required to obtain a warrant before conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)

---

[3] The vehicle was owned by Caldwell's girlfriend's son. Nevertheless, as Caldwell was driving the vehicle shortly before its seizure, the government does not contest that he can raise a Fourth Amendment challenge to the searches. *See United States v. Terry*, 909 F.3d 716, 720 (4th Cir. 2018).

[4] We "may affirm on any grounds apparent from the record." *United States v. Ali*, 991 F.3d 561, 571 (4th Cir. 2021) (internal quotation marks omitted). Because we affirm the district court's decision under the automobile exception, we do not reach the parties' arguments regarding other potentially applicable exceptions or the validity of the warrant.

(per curiam). However, the automobile exception allows police to conduct a warrantless search of a readily mobile vehicle if they have probable cause to do so. *Id.* at 467. Probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Probable cause was present here. The officers located the Impala at the site where they had followed the GPS trackers immediately after the robbery. An officer viewed three individuals fleeing the scene. Despite the significant commotion and large police presence, Caldwell did not call out for officer assistance, and instead was only located by a police dog—which found him hidden in brush on top of a bag containing a GPS tracker and $5,614 of the $5,791.60 that had been stolen. Police observed that the vehicle had an invalid temporary license plate, with a permanent license plate on its back seat. They located a black hooded sweatshirt, a glove, loose currency, a cash wrapper, and a second GPS tracker on the ground in close proximity to the vehicle, and a ski mask on the ground next to it. They observed a revolver and black jacket in plain view on the back seat. The clothing and revolver matched the general description of that used by the robbers. Caldwell himself claimed that he had been carjacked in the Impala, by individuals the police had strong reason to believe had perpetrated the bank robbery.

These numerous observations gave the officers probable cause to believe that the vehicle contained evidence related to the bank robbery. Therefore, pursuant to the automobile exception, they were entitled to search the entire vehicle, including the trunk, without obtaining a warrant. *United States v. Ross*, 456 U.S. 798, 825 (1982) (where the

7

automobile exception applies, "it justifies the search of every part of the vehicle"). That

the officers chose to take the extra precaution of obtaining a warrant prior to the December

9 search does not affect the legal conclusion that a warrantless search was permissible.

Additionally, when a warrantless search of a vehicle could have been conducted on

the scene pursuant to the automobile exception, a warrantless search is also justified after

the vehicle has been impounded and immobilized as long as probable cause still exists.[5]

*Florida v. Meyers*, 466 U.S. 380, 382 (1984) (per curiam) (citing *Michigan v. Thomas*, 458

U.S. 259 (1982) (per curiam); *Chambers v. Maroney*, 399 U.S. 42 (1970)); *see United

States v. Gastiaburo*, 16 F.3d 582, 586 (4th Cir. 1994) (noting that "the justification to

conduct a warrantless search under the automobile exception does not disappear merely

because the car has been immobilized and impounded" and collecting cases).[6] Even where

---

[5] The district court found that the Impala "was a lawfully impounded vehicle." J.A. 204.

[6] Years after this Court's opinion in *Gastiaburo* and the Supreme Court's opinions in *Meyers*, *Thomas*, and *Chambers*, the Supreme Court issued its opinion in *Arizona v. Gant*. *Gant* narrowed certain exceptions to the warrant requirement in order to keep the exceptions rooted in their justifications. *Arizona v. Gant*, 556 U.S. 332, 346–47 (2009). The Court emphasized that a broader interpretation "would serve no purpose except to provide a police entitlement," which was inappropriate because "it is anathema to the Fourth Amendment to permit a warrantless search on that basis." *Id.* at 347. This Court has recently reiterated the same. *United States v. Davis*, 997 F.3d 191, 202–03 (4th Cir. 2021). And notably, the mobility of vehicles is the primary (though not the only) justification for the automobile exception. *See Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018) (noting that ready mobility is the "core justification for the automobile exception" but that an "additional rationale" exists, namely, that mobile vehicles are already pervasively regulated). It is therefore conceivable that the Supreme Court could someday limit the current reach of the automobile exception. *Cf.* Benjamin J. Priester, *A Warrant Requirement Resurgence?: The Fourth Amendment in the Roberts Court*, 93 St. John's L. Rev. 89, 121–25 (2019) (arguing that recent Supreme Court case law could suggest a

a significant amount of time has passed between the impoundment of a defendant's car and a subsequent warrantless search, this Court has found that "the passage of time between the seizure and the search of [the defendant]'s car is legally irrelevant" and the automobile exception still applies as long as probable cause remains to justify the search. *Gastiaburo*, 16 F.3d at 587 (upholding search of impounded vehicle conducted thirty-eight days after impoundment when a new tip gave probable cause to search a previously unsearched hidden compartment in the vehicle).

Accordingly, when detectives returned to the impounded vehicle on December 22— thirteen days after impoundment—to jump-start the car battery and search the trunk, they were justified in doing so without obtaining a warrant. Like in *Gastiaburo*, the passage of time did not interfere with the applicability of the automobile exception. Certainly, "there is no question that time is a crucial element of probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). But here, probable cause to support the search

---

willingness by the Court to reconsider the extent of the automobile exception and noting that "*Chambers* seems particularly dubious now that warrants can be obtained so quickly" because "there is little meaningful possibility that evidence will disappear from a motor vehicle in a secured police facility in the time it would take to obtain an electronic warrant").

Nevertheless, *Gant* did not directly undermine the rationale of *Meyers*, and we are, of course, still bound by both *Meyers* and *Gastiaburo*. *See Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (noting that "[w]e must simply apply [the Supreme Court's] commands" because "it remains the Supreme Court's 'prerogative alone to overrule one of its precedents'" (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997))); *see also United States v. Arriaza*, 401 F. App'x 810, 812 (4th Cir. 2010) (per curiam) ("*Gant* does not undermine this court's jurisprudence pertaining to warrantless searches of impounded vehicles.").

remained intact as of December 22 given that officers were not able to access the trunk during the December 9 search, the trunk remained sealed in the meantime, and officers had not yet located the second weapon.[7] Therefore, both searches fell well within the parameters of the automobile exception, and the district court did not err in denying the motion to suppress.

B.

Next, we review Caldwell's challenge to the district court's denial of his motion to disqualify a witness's counsel and to exclude witness testimony. We review these decisions for abuse of discretion. *See United States v. Urutyan*, 564 F.3d 679, 686 (4th Cir. 2009) (disqualification of counsel); *United States v. Fulks*, 454 F.3d 410, 421 (4th Cir. 2006) (witness testimony).

---

[7] On appeal, Caldwell points to this Court's decision in *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), which he argues undermines *Gastiaburo*. Of course, if the two decisions did conflict, the earlier—*Gastiaburo*—would govern. *United States v. Spinks*, 770 F.3d 285, 289–90 (4th Cir. 2014). But they are distinguishable. The issue in *Pratt* was whether an extended pre-warrant seizure of a defendant's property—there, a cell phone—could become unreasonable with the passage of time. *Pratt*, 915 F.3d at 271. Here, Caldwell has not pressed any argument that the extended seizure of the vehicle was itself unreasonable. Rather, the question is whether the passage of time undermined probable cause supporting a warrantless search. As we describe above, in these circumstances, it did not.

We also note that there is nothing in the record indicating whether the car battery was dead at the time police located the vehicle. However, neither search was performed until after the car was taken into police custody, meaning that *Meyers* and *Gastiaburo* apply. Accordingly, we need not address whether a car with a dead battery satisfies the "readily mobile" requirement of the automobile exception. *Cf. United States v. Poole*, 829 F.2d 37, at *4 (4th Cir. 1987) (unpublished table decision) (automobile exception did not apply to a deserted car that lacked a battery altogether).

10

Caldwell sought to disqualify the counsel who was representing Mitchell—one of Caldwell's teenage coconspirators, who testified against him at trial—and to prevent Mitchell from testifying. The basis of the motion was that Mitchell's counsel, Peter Nicholson, was a public defender based in the same office as Anna McMillan, and McMillan had represented Caldwell when he initially faced state-court charges related to the Wells Fargo robbery. Therefore, Caldwell argued that Nicholson was conflicted out of representing Mitchell for the purposes of Mitchell's testimony against Caldwell, and that Mitchell should not be permitted to testify due to the conflict.

The district court conducted a *voir dire* interview of Nicholson to determine whether a conflict of interest existed that would require his disqualification or the exclusion of his client's testimony. The interview revealed that Nicholson's coworker, McMillan, represented Caldwell in matters related to state charges for the Wells Fargo robbery in December 2016.[8] In February 2018, after Mitchell was arrested for his involvement in the robbery, Nicholson began representing Mitchell. Nicholson testified that he had only become aware of his office's prior representation of Caldwell a few days earlier, that he did not have access to Caldwell's files, and that he knew nothing about Caldwell's case. The district court determined that because there was no "evidence that [Nicholson] had information adverse to [Caldwell] which he provided to [Mitchell]," no "actual conflict"

---

[8] The state stopped pursuing the charges against Caldwell soon after his arrest and ultimately dismissed them. He was federally indicted in February 2017.

existed to create any prejudice to Caldwell. J.A. 1471, 1473. Therefore, Mitchell would be allowed to testify.

However, the district court recognized that under the North Carolina Rules of Professional Conduct, Nicholson might face an ethical problem arising from an imputed conflict if he continued representing Mitchell. To resolve this question, Nicholson contacted the state bar.[9] The bar advised that an imputed conflict existed, but that since it would take time to appoint a new attorney for Mitchell, it was within the court's discretion to allow Nicholson to represent Mitchell during his testimony and withdraw immediately afterward. Reiterating that there was "no real conflict," the district court granted Nicholson permission to represent Mitchell while he testified to avoid further delay of the trial. J.A. 1486. Nicholson ultimately filed a motion to withdraw in the state court five days later, on the date the jury reached its verdict in Caldwell's trial.

We find no abuse of discretion in either of the district court's decisions related to Nicholson and Mitchell. Certainly, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). And when a potential conflict of interest "is brought to the

---

[9] The North Carolina State Bar permits "any lawyer" to "request informal advice from the ethics department" of the bar if the lawyer has questions "[a]fter consulting the Rules of Professional Conduct and the relevant ethics opinions." *Ethics/Rules of Professional Conduct*, N.C. State Bar (last visited July 26, 2021), https://www.ncbar.gov/for-lawyers/ethics/ (saved as ECF opinion attachment).

attention of the trial court, . . . the court has the responsibility to investigate further." *United States v. Tatum*, 943 F.2d 370, 379 (4th Cir. 1991).

But here, the district court seriously considered and took the necessary steps to resolve the ethics and fairness concerns involved. When the court became aware that Nicholson had a potential conflict of interest in representing Mitchell, it investigated the matter. It was faced with an unusual situation; the more typical counsel-witness conflict arises where defense counsel previously represented a government witness. In such a case, the potential conflict of interest lies in the "dual risks of [the attorney] improperly using privileged communications from the previous representation or, by protecting those communications, failing effectively to cross-examine the witness as his present client's interest require[s]." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (citing *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994)).

In this case, however, a *witness's* counsel's office previously represented the *defendant*. Therefore, the cross-examination concern evaporates, leaving only the potential for the improper conveyance of privileged communications. *See United States v. Ramon-Rodriguez*, 492 F.3d 930, 944 (8th Cir. 2007) (noting this danger in a similar situation). Recognizing this, the district court conducted a *voir dire* interview of Nicholson and determined that Nicholson "knew nothing about" his office's earlier representation of Caldwell. J.A. 1473. We conclude that the court acted well within its discretion and did not err in allowing Mitchell to testify.

As for decisions about the disqualification of counsel, the district court has broad discretion and must "exercise its own independent judgment as to whether the proceedings

are likely to have the requisite integrity if a particular lawyer is allowed to represent a party" (or, in this case, a witness). *Williams*, 81 F.3d at 1324. The district court did not abuse its discretion.

Most importantly, the district court satisfied itself that no actual conflict jeopardized the integrity of the proceedings. Further, while the state bar's advice to Nicholson was not binding on the district court's discretion, the court appropriately considered it as supporting guidance. According to that advice, with the district court's permission, Nicholson could ethically represent Mitchell during his testimony and withdraw afterward. Given the broad discretion conferred on the court and the court's finding that Nicholson had not been exposed to any confidential information related to Caldwell, the court acted within its discretion when it allowed Nicholson to represent Mitchell for purposes of his testimony. *See United States v. Medina*, 161 F.3d 867, 870 (5th Cir. 1998) (holding that the district court did not abuse its discretion in allowing a public defender to continue representing her client after discovering an imputed conflict because she "never faced an actual conflict of interest"); *LaSalle Nat'l Bank v. Cnty. of Lake*, 703 F.2d 252, 257 (7th Cir. 1983) ("If the attorney can clearly and persuasively show that he was not privy to the confidences and secrets of the client, a court will not be held to have abused its discretion in concluding that disqualification is unnecessary[.]").

## C.

Caldwell raises additional challenges to the district court's evidentiary rulings, which we also review for abuse of discretion. *United States v. Cloud*, 680 F.3d 396, 401 (4th Cir. 2012). "A court has abused its discretion if its decision is guided by erroneous

legal principles or rests upon a clearly erroneous factual finding." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted).

Evidentiary rulings are also "subject to harmless error review." *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013). "[A]n error is harmless if it's 'highly probable that it did not affect the judgment.'" *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018) (alterations omitted) (quoting *United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980)). "The decisive factors to consider are 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.'" *Id.* at 340–41 (quoting *Nyman*, 649 F.2d at 212). We conclude that any errors related to the challenged evidentiary decisions were harmless.

1.

In presenting its case, the defense entered into evidence a photograph of Caldwell that was purportedly taken a few hours before the robbery on December 9, 2016. The purpose was to show what Caldwell looked like and what he was wearing prior to the robbery.

During cross-examination, the government questioned Caldwell about several alleged discrepancies related to the photograph in order to demonstrate that it had not, in fact, been taken the day of the robbery. First, the government asked Caldwell about the house in the background of the photograph. Caldwell admitted that he no longer lived at that address on December 9, though he explained that he had stopped by the pictured old house to collect items to bring to his new house. Second, the government inquired why

15

Caldwell looked "40 pounds heavier" in another photograph that was indisputably taken on December 9 after the robbery. J.A. 1733.

At issue here is a third line of questioning regarding the photograph. The government pointed out that Caldwell and another person in the photograph were wearing short-sleeved shirts and prompted Caldwell to verify that the photograph was taken on December 9. Caldwell confirmed, adding that "[i]t was warm that day" and that "the sun was out" when the photo was taken around 3:00 P.M. J.A. 1731–32. The government then asked, "Would it surprise you to know the high temperature was 44 degrees on that day at 2:52 p.m.?" J.A. 1732. After the court overruled Caldwell's objection to the question, Caldwell responded that it was indeed a surprise to hear that and that it "[d]idn't seem like it because [he] had on short sleeves." *Id.*

On appeal, Caldwell argues that the court erred when it "allowed the prosecutor to offer evidence of weather conditions through incompetent evidence." Opening Br. at 28–29.[10] As he cites no legal authorities for this argument, "we would be well within our discretion and authority to find this argument forfeited in its entirety." *Burgess v. Goldstein*, 997 F.3d 541, 555 n.6 (4th Cir. 2021) (citing *Li v. Gonzales*, 405 F.3d 171, 175

---

[10] Caldwell also argues that "[t]here was no basis for the court's insinuations nor accusations" regarding whether the exhibit had been changed since the previous trial. Opening Br. at 29. Specifically, *outside the presence of the jury*, the district court asked Caldwell whether the photograph had been altered because, during the first trial, the court had noticed green foliage and grass in the background of the photograph—which now appeared to have been cropped out. As the jury did not hear these comments, Caldwell's argument that he was prejudiced when the jury heard them is without merit.

n.4 (4th Cir. 2005); Fed. R. App. P. 28(a)(8)(A)). In any event, we conclude that even if Caldwell is correct and the court erred in allowing the question, any error was harmless.

First, the government's other questions—noting that the photograph was taken in front of a house that Caldwell no longer lived in on December 9, and that he appeared significantly heavier in another photograph taken later that day—were sufficient to create doubt that the defense's photograph was taken on December 9. And a Charlotte-based jury may well have found it suspicious that the individuals in the photograph were wearing short sleeves in North Carolina in mid-December, even without hearing the details of the weather on that date. Thus, even if the court had not permitted the challenged question, the jury would have had ample reason to doubt the dating of the photograph.

More significantly, even if the government had asked *no* questions about the photograph, it had limited value to Caldwell's defense. At best, the photograph showed what Caldwell looked like earlier in the day before he was allegedly carjacked and beaten repeatedly with a gun. But the government did not dispute that Caldwell was uninjured prior to the robbery. The parties' disagreement centered on the extent and cause of his injuries from the time of the robbery until his arrest. A photograph taken before the robbery could shed no light on that issue. Accordingly, we conclude that even if it was error for the district court to allow the challenged question, that error was harmless.

2.

Prior to his second trial, Caldwell filed a motion for disclosure of the juvenile records of two of the government's witnesses, Mitchell and Cole. Juvenile records are strictly protected under state law, which provides that "[a]ll juvenile records shall be

17

withheld from public inspection and . . . may be examined only by order of the court." N.C. Gen. Stat. § 7B-3000(b) (2019). However, a few specified individuals, including the juvenile and his attorney, may access the records without a court order. *Id.* Accordingly, the government asked the witnesses' attorneys for the records.

Counsel for each witness provided a juvenile delinquency worksheet, which is a standardized form in North Carolina. *See Worksheet Delinquency History Level*, N.C. Jud. Branch (Dec. 2019), https://www.nccourts.gov/assets/documents/forms/j469.pdf (saved as ECF opinion attachment); *see also, e.g.*, *Matter of J.B.*, 809 S.E.2d 353, 357 n.2 (N.C. Ct. App. 2018) (noting that "the delinquency history worksheet . . . tabulates the juvenile's prior history points" and relying on it for the juvenile's delinquency history). It appears that Cole's counsel sent a worksheet that had been prepared for state-court purposes a few months before the robbery and that the prosecution and defense in that case stipulated to the validity of Cole's juvenile criminal history as captured in the worksheet. By contrast, Mitchell's counsel completed a worksheet himself for purposes of complying with the government's request in this case.

Caldwell's counsel raised concerns about the accuracy of the worksheets and about the propriety of an attorney filling out such a worksheet in lieu of providing actual records. In particular, defense counsel noted that Mitchell's counsel must have had access to certain undisclosed records in order to complete the worksheet. Accordingly, Caldwell asked the court to order the witnesses to request copies of their juvenile records and provide them to Caldwell.

The court declined to do so, reasoning that Caldwell would be able to impeach the witnesses using the worksheets. Indeed, defense counsel questioned Cole and Mitchell about their criminal records and referred to their juvenile adjudications during closing arguments.[11] Nevertheless, Caldwell appeals the district court's denial of his request for an order requiring Cole and Mitchell to obtain their juvenile records and provide them to Caldwell for his use in impeaching their credibility.

Caldwell does not explain why he was entitled to such an order—a questionable assertion in light of Federal Rule of Evidence 609(d)'s presumption against the admissibility of evidence of juvenile adjudications and our deferential abuse-of-discretion standard of review. *See United States v. Mangual-Corchado*, 139 F.3d 34, 43 n.23 (1st Cir. 1998). And even if the district court did err, Caldwell has not articulated why such an order would have made any difference. While he asserts general concerns about the worksheets' accuracy, he was indisputably provided with the relevant details of at least some of the witnesses' juvenile adjudications and was able to use them in his defense. Further, he was able to otherwise impeach the credibility of Cole and Mitchell, including by noting inconsistencies in their stories.

Because Caldwell has not articulated any reason why the district court's decision "affect[ed] the judgment," we conclude that, even if the district court erred, such error was harmless. *Burfoot*, 899 F.3d at 340; *see United States v. Kelly*, 510 F.3d 433, 439 (4th Cir.

---

[11] Accordingly, Caldwell's assertions on appeal that the district court did not allow him to impeach Cole and Mitchell with their juvenile records are without merit.

19

2007) (holding that even if the district court erred in excluding evidence of a witness's prior conviction, that error was harmless where "the defense thoroughly attacked [the witness]'s credibility on a variety of other grounds," such as by pointing out inconsistencies in the witness's testimony); *United States v. Baxter*, 54 F.3d 774, at *6 (4th Cir. 1995) (per curiam) (unpublished table decision) (finding an abuse of discretion where the court refused to permit questions related to the key government witness's juvenile adjudication but nevertheless concluding the error was harmless because the witness's "credibility was attacked on the stand despite the exclusion of the juvenile adjudication evidence" and there was otherwise "overwhelming evidence of [the defendant's] guilt").

D.

Caldwell next argues that the district court erred when it ordered him to disclose his private investigator's notes, which were protected as work product. *See United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (holding that the work-product privilege protects an attorney's investigator's notes compiled in preparation for trial). "We review evidentiary rulings, including rulings on privilege, for abuse of discretion, factual findings as to whether a privilege applies for clear error, and the application of legal principles de novo." *United States v. Hamilton*, 701 F.3d 404, 407 (4th Cir. 2012) (citation omitted).

Caldwell called his private investigator, Royetta Sieminski, as a witness to impeach Mitchell's testimony regarding a conversation that had occurred between Sieminski and Mitchell. Caldwell alleges that the district court erroneously required him to disclose the notes Sieminski took related to that conversation. Yet the record makes clear that the court imposed no such requirement.

20

The government informed the district court that it had not "received any tangible documents" from Sieminski. J.A. 1482. In response, defense counsel invoked the work-product privilege to protect Sieminski's notes. After reviewing the notes *in camera*, the court asked for the parties' views. During the ensuing discussion—and before the court had made any ruling as to the claim of privilege—defense counsel agreed to send the notes to the government. "[W]hen an attorney freely and voluntarily discloses the contents of otherwise protected work product to someone with interests adverse to his or those of the client, . . . he may be deemed to have waived work product protection." *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981). Having dropped the argument for work-product privilege before the district court, and having affirmatively agreed to voluntarily disclose the notes, Caldwell is not now entitled to pursue such privilege here. Accordingly, we hold that Caldwell waived his claim of work-product privilege.[12]

E.

Next, citing *Brady v. Maryland*, 373 U.S. 83 (1963), Caldwell alleges that the district court erred when it did not conduct an *in camera* review before denying his request for certain *Brady* material, namely, the names and addresses of two individuals who spoke to Cole during his police interview.[13] We disagree.

---

[12] Further, even if Caldwell had not waived the privilege by voluntarily disclosing the notes, he waived protection of the notes "with respect to matters covered in [Sieminski's] testimony" by choosing to call her as a witness. *Nobles*, 422 U.S. at 239.

[13] In headings, his statement of issues, and an introductory sentence in his brief, Caldwell also argues that the district court erred in failing "to conduct an in camera review before denying his request for production of grand jury transcripts . . . and officers'

21

*Brady* requires "the disclosure [by the government] of evidence that is 'both favorable to the accused and material to guilt or punishment.'" *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). "In reviewing the district court's denial of [Caldwell]'s *Brady* motion, we review the district court's legal conclusions de novo and its factual findings for clear error." *Id.* (alterations omitted) (quoting *United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011)).

Further, where a defendant "'at least make[s] some plausible showing'" that the particular information sought exists and that "it would be 'both material and favorable to his defense,'" he is "entitled . . . to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly reviewable judicial determination made whether any portions meet the 'material' and 'favorable' requirements for compulsory disclosure." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995) (quoting *Ritchie*, 480 U.S. at 58 n.15). But "[m]ere speculation that the information may be helpful is insufficient to justify an *in camera* review." *United States v. Savage*, 885 F.3d 212, 221 (4th Cir. 2018) (quoting *United States v. Gilchrist*, 119 F. App'x 485, 491 (4th Cir.) (per curiam), *partial reh'g granted on other grounds*, 137 F. App'x 520 (4th Cir. 2005) (per curiam)).

Caldwell sought the names and contact information of a man and a woman who each, separately, entered the interrogation room during breaks in officers' interrogations of

---

investigative notes." Opening Br. at 45. As Caldwell has entirely failed to develop these arguments, he has waived them. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

Cole. Caldwell claims that these individuals pressured Cole to implicate Caldwell and fed him information about Caldwell. At the time of the interview, Cole denied knowing Caldwell. But, roughly six months later, he changed his tune and implicated Caldwell. The government revealed that the individuals were Cole's mother and her boyfriend, but declined to provide their contact information.

Before the district court, Caldwell argued that he needed the contact information because he did not know how Cole's mother and her boyfriend had information about Caldwell or "how or when/where law enforcement provided them with the information allegedly about Caldwell that was used to attempt to induce Cole to cooperate with law enforcement"; "what other [undisclosed] information these people or law enforcement ha[d] about Mr. Caldwell"; and "what kind of pressure was put [on] Cole to change his story" from not knowing Caldwell to naming Caldwell as the ringleader. J.A. 878–79. Accordingly, in his view, the pair had "become material witnesses in this case" and were "relevant in establishing the tactics used by the government in the investigation of this matter"—those tactics being that the police fed information about Caldwell to Cole's mother and her boyfriend for use in pressuring Cole to implicate Caldwell. J.A. 879. The district court denied the motion because "the government ha[d] advised that it [did] not plan on calling those individuals in its case-in-chief."[14] J.A. 897.

---

[14] We note that, if the government *had* planned to call Cole's mother or her boyfriend as a witness, their contact information would have been "nondiscoverable" pursuant to the district court's discovery order, at least "absent a special showing of need." Standard Criminal Discovery Order at 2, District Court Dkt. (May 5, 2017) (first quoting Fed. R. Crim. P. 16 advisory committee's note to 1975 enactment); *see United States v.*

Caldwell has not made a plausible showing that the contact information he sought was material and favorable to his defense, as required to entitle him to *in camera* inspection of that information. Rather, he can only speculate as to what information interviews with Cole's mother and her boyfriend would have produced. For example, he argues that the pair would have been able to speak to the police's tactics in coaxing Cole to implicate Caldwell. But, for all we know from the record, Cole's mother and her boyfriend could have had independent knowledge of Caldwell—perhaps obtained from Cole himself in earlier, private conversations—that they relied on in speaking to him.

In other words, the fact that the two had knowledge of Caldwell does not necessarily mean they obtained that information from the police in a concerted effort to pressure Cole. Further, as noted, Cole did not implicate Caldwell until six months later. Accordingly, Caldwell's argument that the contact information was relevant because Cole's mother and her boyfriend would be able to shed light on police interview tactics "is pure speculation lacking any specificity, and is insufficient to support a finding of materiality under *Brady* or to require an *in camera* review."[15] *Savage*, 885 F.3d at 222.

---

*Jones*, 469 F. App'x 175, 180 (4th Cir. 2012) (per curiam) (unpublished but orally argued) ("We have long held that defendants are 'not entitled of right, in a non-capital case, to . . . pretrial disclosure[]' [of the government's witness list]." (alterations omitted) (quoting *United States v. Anderson*, 481 F.2d 685, 693 (4th Cir. 1973))).

[15] We do not understand Caldwell to assert that Cole's mother and her boyfriend were police informants, but rather that they could provide information to him *about* the police. To the extent he implies that they may have given information to the officers, however, the government was not required to disclose information about them. *See United States v. Bell*, 901 F.3d 455, 466–67 (4th Cir. 2018) ("[W]e have held . . . that the government is privileged to withhold the identity of an informant when he was a mere

24

Additionally, we note that it is unclear what benefit *in camera* review would have had in a case such as this, where the district court could evaluate the value of the requested material (contact information) without needing to actually review it. Simply put, Caldwell has not articulated any reason why the specifics of the contact information (e.g., a precise phone number or address) would alter the district court's *Brady* analysis in this case. But, in any event, Caldwell has failed to make a showing of materiality under either *Brady* or the less onerous standard for *in camera* review. *Id.* Accordingly, the district court correctly denied the motion.

F.

At the close of the government's case, at the close of his own case, and again after the jury verdict, Caldwell moved for a judgment of acquittal based on insufficiency of the evidence pursuant to Federal Rule of Criminal Procedure 29. The district court summarily denied the motions. We affirm.

"We review a challenge to the sufficiency of the evidence de novo, and we must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it." *United States v. Bran*, 776 F.3d 276, 279 (4th Cir. 2015) (citation omitted). "In undertaking this analysis," we must bear in mind that "'the jury, not

---

tipster[.]" (alterations and internal quotation marks omitted) (quoting *United States v. Gray*, 47 F.3d 1359, 1365 (4th Cir. 1995))); *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985) (en banc) ("Dual interests arise from nondisclosure of informers and the information they possess. First, the public interest is served by nondisclosure because it encourages persons to come forward with information that can aid effective law enforcement. Second, the safety and security of the person supplying the information is best protected by nondisclosure of his identity to those who may cause him harm.").

the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented.'" *United States v. Ath*, 951 F.3d 179, 185 (4th Cir.) (alterations omitted) (quoting *United States v. Palacios*, 677 F.3d 234, 250 (4th Cir. 2012)), *cert. denied*, 140 S. Ct. 2790 (2020).

Viewing the evidence in the light most favorable to the government, ample evidence supported the verdict. Witness testimony supported that Cole and Mitchell entered the bank, held the tellers at gunpoint, and made off with thousands of dollars in cash. Cole and Mitchell testified that they did so at Caldwell's direction and using guns he provided, and that he drove them from the bank after the robbery. An officer who tracked the stolen cash testified to having seen three individuals fleeing the getaway car on foot—not, as Caldwell claimed, two individuals forcing a third to run with them by pushing and pulling on him. Several officers testified to the fact that the police presence was quite obvious, and yet Caldwell did not emerge seeking their help for a carjacking. Rather, an officer walked right past Caldwell, who was well hidden in the brush—on top of a bag containing nearly all of the stolen cash. Caldwell claimed that he had passed out from head injuries and only awoke when the police dog bit him, which could explain why he did not seek police assistance. Yet, other than his testimony, there is no evidence to support anything like the extensive lacerations to his head that he described as a result of the alleged pistol-whipping. Instead, after his arrest, he had only injuries to his arm from being bitten by the police dog as well as some bruising to his left eye and a minor abrasion on his head. Finally, the vehicle he was driving had a falsified temporary tag mounted on its rear in lieu of an actual license plate, which was instead discovered on the back seat alongside a revolver. A second

26

revolver was located in the trunk. Considering all of this evidence, the jury was well within its rights to return a guilty verdict on all counts.

Caldwell argues on appeal that there was no evidence to tie him to Cole and Mitchell as a coconspirator, "other than their words and testimony at trial," or to connect him with the guns. Opening Br. at 56. Yet the jury was entitled to credit Cole and Mitchell's testimony that Caldwell planned the robbery and provided the guns, and to disbelieve Caldwell's competing testimony. *See Kelly*, 510 F.3d at 440 ("[W]e do not weigh the evidence or assess the credibility of witnesses, but assume that the jury resolved any discrepancies in favor of the government."). Caldwell also argues that there is no evidence that the guns found in his car were used in the robbery. But the jury was entitled to infer that they were: Cole and Mitchell indisputably possessed two guns during the robbery; they testified that Caldwell provided those guns; and two guns were located in the getaway vehicle immediately after the robbery alongside dark clothing that Cole and Mitchell wore in carrying out the robbery. *Cf. United States v. Branch*, 537 F.3d 328, 342–43 (4th Cir. 2008) (affirming the denial of a motion for judgment of acquittal on a charge of illegal possession of a firearm by a felon where the defendant was driving a vehicle that contained a concealed firearm, even though the defendant did not own the vehicle, given other evidence suggesting he was aware of the vehicle's contents).

Finally, Caldwell points to the lack of DNA or fingerprint evidence tying him to the guns. But the jury could easily have concluded that Caldwell must have wiped down the guns before providing them to Cole and Mitchell; that he avoided touching them directly, such as by handling them with gloves; or that his DNA and fingerprints simply did not

27

transfer to the gun's surfaces when he handled them, which evidence introduced before the jury indicated was possible. Further, the lack of Caldwell's DNA on the firearms also undermined Caldwell's version of events, in which Cole and Mitchell beat him bloody with the guns.

Accordingly, we affirm the district court's denial of Caldwell's Rule 29 motions.

## G.

Caldwell also raises two arguments for the first time on appeal, for which plain-error review under Federal Rule of Criminal Procedure 52(b) applies. *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (citing *United States v. Olano*, 507 U.S. 725, 735 (1993)). To succeed in obtaining plain-error relief, a defendant must show (1) an error, (2) that is plain, (3) and that affects substantial rights, "which generally means that there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Id.* (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018)). If the defendant satisfies these "three threshold requirements," we "may grant relief if [we] conclude[] that the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 2096–97 (quoting *Rosales-Mireles*, 138 S. Ct. at 1904). We sometimes refer to this final question as the fourth prong of the plain-error test. *E.g.*, *United States v. Simmons*, 999 F.3d 199, 227 (4th Cir. 2021).

## 1.

Caldwell first points to the testimony of Diane Popichak, the government's rebuttal witness and a health services administrator at the jail where Caldwell was brought after his arrest. She testified as a records keeper regarding the medical records from the jail; the

government did not seek to qualify her as a medical expert. Caldwell argues that her testimony crossed the line into expert testimony and that this constituted plain error. However, he does not point to specific testimony that he alleges constitutes error, and he makes only cursory arguments with regard to the third and fourth prongs of the plain-error analysis. We could, therefore, deem this argument waived for failure to develop it. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

Regardless, even if Caldwell is correct that there was an error that was plain, he would not be able to demonstrate that it affected his substantial rights—that is, that there exists "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer*, 141 S. Ct. at 2096.

Only a few items of Popichak's testimony are possibly relevant to this challenge: defining the word "abrasion" as a superficial injury; explaining that a "[t]ender scalp with no clear focality" would mean "[t]hat there is no center point, origination point or contact point for the wound"; and noting that there was nothing in the medical records consistent with treatment "for being beaten with two heavy metal objects." J.A. 1880, 1895, 1897. But there is no reason to suppose that the jury would have returned a different verdict had these snippets of testimony not been allowed. The records noted a one-centimeter abrasion and a swollen left eye, but no other significant head injuries. Popichak testified that inmates need to be declared fit for confinement before entering the jail, meaning that an inmate presenting with significant injuries would need to be cleared by the hospital before the jail would accept him—but no such preclearance was required in this case, suggesting the nurse

29

on duty did not find his injuries substantial. And the jury was able to view an image of Caldwell from the night of his arrest and gauge for itself the severity of his injuries.

We conclude that, with or without Popichak's explanations, the evidence was not sufficient to support Caldwell's account of a severe beating to his face and head with a firearm that left him with blood "running down [his] face," gave him "all kind[s] of gashes" "all over [his] head," "[d]id a lot of damage," and caused him to pass out. J.A. 1684, 1696, 1720, 1734. While the jury need not have accepted Caldwell's testimony on these points in order to acquit him (if they believed, for example, that Cole and Mitchell carjacked him with threats but that his claims of a beating were an exaggeration), the jury was certainly entitled to consider the inconsistencies between his testimony and the other evidence in weighing the validity of his testimony and returning a guilty verdict. Those inconsistencies were apparent without Popichak's challenged testimony. And, as noted above, significant additional evidence pointed to his guilt. Caldwell thus cannot meet the heavy burden of establishing entitlement to relief for plain error.

2.

Finally, for the first time on appeal, Caldwell argues that he is entitled to relief under the Supreme Court's decisions in *United States v. Davis*, 139 S. Ct. 2319 (2019), and *Rehaif v. United States*, 139 S. Ct. 2191 (2019). Both arguments are foreclosed by binding precedent.[16]

---

[16] Because the Supreme Court issued its opinions in *Davis* and *Rehaif* after Caldwell filed his Opening Brief, we will exercise our discretion to excuse the fact that he did not raise arguments related to those opinions until his Reply Brief. *See United States v.*

a.

The jury found Caldwell guilty of Count III, possession of a firearm in furtherance of a crime of violence, as prohibited by 18 U.S.C. § 924(c)(1)(A). The underlying crime of violence was specified in the indictment and the jury instructions as Count II, aiding and abetting bank robbery. 18 U.S.C. §§ 2, 2113(a), (d).

Section 924(c)(3) defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the "force clause"), or "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "residual clause"). *Id.* § 924(c)(3)(A), (B). In *Davis*, the Supreme Court struck down the residual clause as unconstitutionally vague. *Davis*, 139 S. Ct. at 2324. However, convictions under the force clause remain valid. *E.g.*, *United States v. Mathis*, 932 F.3d 242, 263–64 (4th Cir. 2019).

This Court has held that bank robbery under either § 2113(a) or (d) is a crime of violence under § 924(c)(3)'s force clause. *United States v. McNeal*, 818 F.3d 141, 157 (4th Cir. 2016). Further, we have held that "aiding and abetting a crime of violence is also categorically a crime of violence." *United States v. Ali*, 991 F.3d 561, 574 (4th Cir. 2021) (citing 18 U.S.C. § 2 and *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010), and

*Venable*, 943 F.3d 187, 192 (4th Cir. 2019) (noting our discretion to excuse a party's waiver of an argument). Any other arguments raised for the first time in his Reply Brief, however, we deem waived. *See Grayson O Co.*, 856 F.3d at 316 ("A party waives an argument by failing to present it in its opening brief[.]")

31

collecting cases); *see also Johnson v. United States*, 774 F. App'x 334, 335 (8th Cir. 2019) (per curiam) (applying the same reasoning to a § 2113 aiding-and-abetting conviction). Accordingly, Caldwell's conviction for aiding and abetting § 2113 bank robbery can still serve as a predicate for his § 924(c) conviction, even after *Davis*.

b.

Caldwell was also convicted, in Count IV, of possessing a firearm as a convicted felon. 18 U.S.C. § 922(g)(1). His indictment did not indicate, and the jury was not instructed, that this charge required the government to prove that he *knew* he was a felon at the time of the firearm possession. But in *Rehaif*, the Supreme Court concluded that to obtain a § 922(g) conviction, the government "must show that the defendant knew he possessed a firearm *and also that he knew he had the relevant [felon] status when he possessed it*." *Rehaif*, 139 S. Ct. at 2194 (emphasis added).

Still, plain-error review applies to unpreserved *Rehaif* errors such as this one. *Greer*, 141 S. Ct. at 2096. Caldwell can satisfy the first two prongs: there was an error, and it is plain. *Id.* at 2097. But he cannot show that the *Rehaif* error affected his substantial rights. *Id.* As the Supreme Court has noted, "[i]n a felon-in-possession case where the defendant was in fact a felon when he possessed firearms, the defendant faces an uphill climb in trying to satisfy the substantial-rights prong of the plain-error test based on an argument that he did not know he was a felon. The reason is simple: If a person is a felon, he ordinarily knows he is a felon." *Id.*

Certainly, the mere undisputed fact that Caldwell was a felon at the time of the robbery is not dispositive. "[T]here may be cases in which a defendant who is a felon can

make an adequate showing on appeal that he would have presented evidence in the district court that he did not in fact know he was a felon when he possessed firearms." *Id.* This could occur, for example, where a defendant was previously convicted of "a crime *punishable* by imprisonment for a term exceeding one year," but was sentenced to a term less than a year or to probation. 18 U.S.C. § 922(g)(1) (emphasis added). Such a defendant may not have been aware of what punishments were *permitted* for his prior conviction, and thus that he was considered a felon under § 922(g)(1). *See Rehaif*, 139 S. Ct. at 2198; *Greer*, 141 S. Ct. at 2103 (Sotomayor, J., concurring in part and dissenting in part) (noting this and other possible reasons a defendant might be able to show he was not aware of his felon status). "But if a defendant does not make such an argument or representation on appeal, the appellate court will have no reason to believe that the defendant would have presented such evidence to a jury, and thus no basis to conclude that there is a 'reasonable probability' that the outcome would have been different absent the *Rehaif* error." *Greer*, 141 S. Ct. at 2097 (majority opinion). Caldwell has made no such argument here.

Moreover, the same factors that the Supreme Court found relevant in dismissing the *Rehaif* challenge in *Greer* are present here. Before the date of the robbery, Caldwell "had been convicted of multiple felonies." *Id.* He has never disputed the validity of these felony convictions, and indeed, he stipulated at trial to having had such a conviction. *Id.* at 2098. We also note that Caldwell had, on several occasions, served sentences longer than a year—including two stints of more than five years each in federal prison—making it virtually impossible to believe he did not know he had been convicted of crimes punishable

33

by such sentences. Caldwell therefore has not demonstrated plain error with regard to his § 922(g) conviction.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*