**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 23-4234**

—————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REGINALD ANTONIO TWITTY,

Defendant - Appellant.

—————————

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Timothy M. Cain, Chief District Judge.  (6:19-cr-00898-TMC-1)

—————————

Argued:  March 19, 2025                    Decided:  July 22, 2025

—————————

Before THACKER, RICHARDSON, and RUSHING, Circuit Judges.

—————————

Affirmed by unpublished opinion.  Judge Thacker wrote the majority opinion, in which Judge Richardson and Judge Rushing joined.  Judge Thacker wrote a separate concurring opinion.

—————————

**ARGUED:**  Elizabeth Anne Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant.  Leesa Washington, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.  **ON BRIEF:** Jillian M. Lesley, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant. Adair F. Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

—————————

2

Unpublished opinions are not binding precedent in this circuit.

THACKER, Circuit Judge:

Reginald Antonio Twitty ("Appellant") was the subject of an investigation into alleged drug trafficking between July 2018 and October 2019. Appellant was indicted in October 2019 and ultimately pled guilty to conspiracy to commit drug trafficking and possession of a firearm in furtherance of a drug crime. In doing so, Appellant reserved his right to appeal the denial of two motions to suppress in connection with a vehicle search and certain GPS tracking warrants utilized during the investigation. The district court subsequently sentenced Appellant to 144 months of imprisonment.

On appeal, Appellant argues that the vehicle search and the GPS tracking warrants were not supported by probable cause. Appellant further argues that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act"), 18 U.S.C. §§ 2510 *et seq.*, should apply to the Government's GPS monitoring of him "because the great invasion of privacy that results from . . . [GPS tracking] is akin to that of a wiretap." Appellant's Opening Br. at 44. Finally, Appellant argues that the Government's lengthy delays before filing the warrant returns[1] require suppression of the evidence against him. In response, the Government urges us to enforce Appellant's appeal waiver.

We conclude that Appellant's appeal waiver is ambiguous and, therefore, unenforceable. As set forth in detail below, on the merits, we hold that probable cause supported the vehicle search and that the fruits of the search constituted a substantial basis

---

[1] Federal Rule of Criminal Procedure 41(f)(2)(B) requires the officer executing a warrant for a tracking device to return it to the judge designated in the warrant within 10 days after the end of the tracking.

3

to issue the GPS tracking warrants. We further hold that the Wiretap Act does not apply here because the contents of Appellant's wire communications were not intercepted. Finally, we hold that the district court did not err in declining to suppress evidence based on the Government's numerous and lengthy delays in filing the warrant returns because Appellant has failed to allege that he was prejudiced by the late returns.

Therefore, we affirm.

## I.

### A.

#### The Investigation

##### 1.

##### 2018 Package Interception

In July 2018, the United States Postal Inspection Service ("USPIS") intercepted a priority mail package, which was en route to Greenville, South Carolina, from Los Alamitos, California. The USPIS agents in California obtained a warrant authorizing a search of the package. The package contained approximately two kilograms of cocaine. A latent fingerprint analysis conducted by the USPIS forensic laboratory revealed Appellant's fingerprint on the inner flap of the package.

##### 2.

##### Mississippi Nissan Sentra Search

Eight months later, on March 15, 2019, in Mississippi, Deputy John Johnson, who had 23 years of law enforcement experience, initiated a traffic stop on a commercial tractor trailer transporting multiple vehicles (the "car hauler"). As Deputy Johnson approached

4

the driver of the car hauler, he noticed a blue Nissan Sentra in the middle of the car hauler. The Nissan Sentra captured the attention of Deputy Johnson because he observed that the undercoating of the vehicle, a paint-like substance that serves as a barrier to prevent the onset of rust or oxidation, appeared to be freshly applied in spots rather than uniformly applied all at once as would be typical. Deputy Johnson further observed that the heat shield, a thermal guard to protect the underside of the vehicle from the heat generated by the engine and exhaust system, was bent at a downward angle. And he observed "tooling" to the bolts on the underside of the vehicle, which indicated a removal and reinstallation of the bolts. J.A. 162.[2] Based on these indicators -- along with his knowledge that the Nissan Sentra is a type of vehicle commonly outfitted by drug traffickers with hidden compartments, or "floor traps," used to store money or drugs -- Deputy Johnson concluded that the vehicle could be involved in drug trafficking activity. J.A. 161.

The driver of the car hauler provided Deputy Johnson with the registrations and bills of lading for the vehicles on the car hauler. The bill of lading for the Nissan Sentra reflected that it was being shipped from an individual named Jorge Crespo in Long Beach, California, to Appellant in Greenville, South Carolina. But, the issuer's signature at the bottom of the bill of lading was "Javier," which, to Deputy Johnson, "appeared to be different from the sender." J.A. 165, 578–80. According to Deputy Johnson, the person who signs to ship the vehicle, in this case Jorge Crespo, is typically the same as the issuer who signs the bottom of the bill of lading. Since that was not the case in this instance,

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Deputy Johnson found it suspicious that "too many people [were] involved in this vehicle." J.A. 165. The phone numbers listed on the bill of lading also stood out to Deputy Johnson because both were from California even though the vehicle was being shipped to Appellant in South Carolina. Deputy Johnson ran the license plate of the Nissan Sentra and determined that it was registered to the sender, Jorge Crespo, but at a post office box address which was different than the shipping address associated with the vehicle's sender listed on the bill of lading. These facts further indicated to Deputy Johnson that the vehicle may have been involved in drug trafficking activity.

As a result, Deputy Johnson asked the driver of the car hauler for consent to search the vehicle. The driver consented. Deputy Johnson conducted a search of the Nissan Sentra while it was still on the car hauler on the side of the road. When Deputy Johnson opened the door of the vehicle, he smelled fresh paint and noticed further tooling on the bolts holding the seats in place. He also discovered "unaccounted for space between the floor and undercarriage" after conducting a depth check[3] with his hand. J.A. 168. These observations indicated to Deputy Johnson that the seats had been removed from the Nissan Sentra in order to install a floor trap underneath them. Thereafter, Deputy Johnson and another officer pulled up the vehicle's carpet and discovered further evidence of modifications, including new sheet metal on the floor and hinges behind the front seats.

---

[3] To conduct a depth check, an officer "stick[s] [their] hand on [the floor of the vehicle] and the bottom" of the vehicle to ascertain whether "excessive" or "unaccounted for" space is present. J.A. 167–68. The purpose of the test is to understand whether there may be a modified area within a vehicle that could hold contraband.

6

At that point, Deputy Johnson requested that the driver of the car hauler follow him to the law enforcement automobile shop where the driver unloaded the Nissan Sentra from the car hauler. A K-9 unit conducted a dog sniff, and the dog alerted that the vehicle was positive for narcotics. After further inspecting the vehicle by lifting the sheet metal and lifting the driver and passenger seats to gain access to the compartments under each seat, Deputy Johnson discovered two floor traps. He was able to gain access to the hidden compartments, but the compartments were empty.

3.

Mississippi GPS Warrant

The same day, Investigator Jon Cooley, a task force officer with Homeland Security Investigations ("HSI") in Jackson, Mississippi, joined the investigation. Because the Nissan Sentra had been headed to Greenville, South Carolina, Investigator Cooley conferred with HSI Special Agent Paul Criswell and HSI Task Force Officer Donnie Gilbert, who were based in Greenville, South Carolina. Investigator Cooley and Special Agent Criswell, with input from the respective state and federal prosecuting attorneys in Jackson and Greenville, decided that Investigator Cooley would obtain a Mississippi GPS warrant authorizing investigators to place a tracking device on the Nissan Sentra. The officers further determined that Special Agent Criswell's team in South Carolina would then pursue a federal tracking warrant at the "earliest convenient time." J.A. 188. Investigators in Mississippi were also informed by the South Carolina investigators that Appellant had "an extensive history for drug violations and violent crime." J.A. 138.

7

As planned, on the same evening, Investigator Cooley obtained a Mississippi state search warrant authorizing the installation of a GPS tracking device on the Nissan Sentra ("the Mississippi GPS Warrant"). The affidavit submitted with the warrant application detailed Deputy Johnson's traffic stop; what was observed during the subsequent search of the Nissan Sentra, including the smell of fresh paint, the tooling marks to the bolts, and the positive dog sniff; and the fruits of the search, that is, the floor traps. The affidavit also explained that the Nissan Sentra's bill of lading reflected that the vehicle would be delivered to Appellant, who had a criminal history that included drug violations. Finally, the affidavit reflected that that Investigator Cooley had 26 years of experience investigating drug trafficking and that investigators believed the vehicle would be used in furtherance of drug trafficking, particularly because investigators have learned that drug traffickers are using car haulers as a means to distance themselves from vehicles transporting drugs and money.

Pursuant to the Mississippi GPS Warrant, a return of the warrant was due 45 days later, that is, April 29, 2019. Deputy Johnson installed the device on the vehicle in the presence of Officer Cooley the same day the warrant was issued. According to Investigator Cooley, the return was not made until "several months later." J.A. 149.

4.

South Carolina GPS Warrant

On March 19, 2019, once Special Agent Criswell knew that the Nissan Sentra had arrived in South Carolina, he applied for a search warrant to install a GPS tracking device on it ("the South Carolina GPS Warrant"). The affidavit submitted with the warrant

8

application detailed the July 2018 package interception and subsequent USPIS investigation, the Mississippi Nissan Sentra search, and the Mississippi GPS Warrant. The affidavit also averred that investigators believed Appellant was using the vehicle to transport drug proceeds from South Carolina to California, that the vehicle had been and would continue to be used to further a drug conspiracy, and that the GPS tracker would ultimately lead to further evidence. A federal magistrate judge in Greenville, South Carolina granted the warrant. Pursuant to the South Carolina GPS Warrant, a return of the warrant was due ten calendar days after the use of the tracking device ended.

Instead of installing a new GPS tracking device in South Carolina, HSI investigators gained access to and monitored the Nissan Sentra using the same device that had been installed in Mississippi. Agents tracked the delivery of the vehicle to Spartanburg, South Carolina.

The South Carolina GPS Warrant return reflects that the monitoring occurred from March 19 to April 21, 2019, and that the tracking device was removed on October 6, 2019. The return of the South Carolina GPS Warrant was not made until January 21, 2020.

5.

Ping Warrants

As the investigation continued, agents reviewed Appellant's Department of Motor Vehicle ("DMV") records, United States Postal Service ("USPS") records, and flight records. They also conducted physical surveillance of Appellant and his girlfriend, who was believed to be a co-conspirator. Based upon these investigations, agents learned that Appellant was using multiple telephones, which were referred to throughout the

9

investigation as target telephones one, two, and three ("TT-1," "TT-2," "TT-3"). Investigators applied for and obtained three warrants for real time tracking and geo-location monitoring of these telephones (the "Ping Warrants"). The Ping Warrants were based, in part, on the July 2018 USPIS package interception and the March 2019 Mississippi Nissan Sentra search. The Ping Warrants were granted on March 21, 2019, (TT-1), August 29, 2019, and September 27, 2019, (TT-2),[4] and September 9, 2019, (TT-3).

The Ping Warrants authorized the acquisition of both historical cell site data and geo-location data, either through real time tracking data[5] or through the GPS function of the target telephone. The Ping Warrants authorized acquisition of historical cell site data for 30 days prior to the date the order was signed, as well as geo-location data for either ten days from the date the order was signed or thirty days after the order was served on the service provider of the target telephone, whichever date occurred sooner. Each warrant stated that a written return was to be made to the magistrate judge within ten calendar days of the order's expiration. The returns for the three Ping Warrants were not made until January 28 and 29, 2021.

---

[4] After the initial monitoring period for TT-2 expired, law enforcement filed an application for an extension of the warrant for TT-2.

[5] The Ping Warrants explained that the real time tracking data included the target telephone's location, range, bearing, timing and signal strength data in relation to the cellular tower.

6.

Package Interceptions

Appellant's USPS records revealed ten different addresses associated with Appellant in Greenville, Spartanburg, and Roebuck, South Carolina. USPIS investigations into parcels sent to Appellant's known addresses revealed 50 suspect parcels, containing a total of 450 pounds of suspected drugs, which were similar in appearance to the July 2018 intercepted parcel that began the investigation and contained two kilograms of cocaine.

From April 17 to April 26, 2019, 15 packages were mailed from the Los Angeles, California area to addresses associated with Appellant in South Carolina. On April 22, 2019, agents executed a search warrant on an intercepted parcel shipped to one of Appellant's known addresses. Agents discovered two "bundled bricks which were wrapped in birthday wrapping paper, duct tape, vacuum-seal, and carbon paper." J.A. 463. After opening the packages, agents discovered a white powder that field tested positive for cocaine. The package contained 2.35 kilograms of cocaine. The cell phone number associated with this package was the number for TT-1.

Flight information for Appellant reflected that he made numerous trips between Greenville, South Carolina and Los Angeles, California, which corresponded with inbound parcel shipments from California to Appellant's known addresses in South Carolina. When booking those flights, Appellant provided TT-2 as his telephone number.

On September 5, 2019, USPIS agents deployed a K-9 unit to conduct a dog sniff on a parcel travelling from one of Appellant's known South Carolina addresses to a California address. The drug dog alerted for the presence of narcotics. Thereafter, law enforcement

11

executed a search warrant for the contents of the parcel. The parcel contained $45,000 in cash, and it was packaged in a similar manner to the previously intercepted drug packages -- in birthday wrapping paper in vacuum seal bags with dryer sheets, carbon paper, packing paper, and silver duct tape. The telephone number associated with TT-3 was used to request status updates for that parcel. USPS employees at the location from which the package was shipped in South Carolina identified Appellant's girlfriend as the person who mailed the package.

### 7.

### Appellant's Arrest

Because law enforcement knew Appellant was travelling to South Carolina, they were stationed at the Georgia/South Carolina border with the goal of intercepting him. On October 6, 2019, Greenville County Deputy Sherriff William Jumper, who was also an HSI task force officer, conducted a traffic stop and search of Appellant's vehicle in South Carolina. Deputy Jumper stopped Appellant because he was speeding. Deputy Jumper was aware that Appellant had an outstanding arrest warrant based upon the investigation described above. Therefore, after informing Appellant that the vehicle was stopped for speeding, Officer Jumper informed other HSI officers that he had detained Appellant. Task Force Officers Chris Hines and David Harrison responded to Officer Jumper's call. Officer Harrison arrested Appellant pursuant to the arrest warrant. Meanwhile, after a K-9 unit conducted a dog sniff and the drug dog alerted that the vehicle was positive for narcotics, Officers Jumper and Hines searched Appellant's vehicle. The officers discovered two after-market hidden compartments in the vehicle. The compartments contained over nine

12

kilograms of cocaine, more than two kilograms of methamphetamine, and approximately 986 grams of heroin.  Officers also seized an AR-15 rifle and ammunition from the vehicle.

Thereafter, federal search warrants were executed at three residences known to be associated with Appellant and investigators recovered two kilograms of cocaine, five kilograms of heroin; approximately 891 grams of a mixture containing heroin, morphine, and codeine; and approximately 250 grams of morphine.  Four firearms, various assorted ammunition, and drug distribution paraphernalia were also seized.

## B.

## The Prosecution

On November 5, 2019, a federal grand jury returned an indictment charging Appellant and his girlfriend with conspiracy.  Appellant was charged with one count of conspiracy to possess with intent to distribute and to distribute heroin, marijuana, methamphetamine, and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(D), and 846 (Count 1); three counts of unlawful use of a communication facility in violation of 21 U.S.C. §§ 843(b) and 18 U.S.C. § 2 (Counts 2, 3, 4); one count of interstate travel and transportation in aid of drug trafficking business in violation of  18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2 (Count 6);[6] and one count of possession with intent to distribute one kilogram or more of heroin, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and five kilograms or more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C.

_____

[6] Appellant was not charged in Count 5 of the indictment.

§§ 841(a)(1) and 841(b)(1)(A) as well as 18 U.S.C. § 2 (Count 7). On October 13, 2020, a federal grand jury returned a superseding indictment, adding charges as to Appellant -- one count for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g), 924(a)(2), and 924(e) (Count 8), and one count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count 9).

On January 23, 2022, Appellant filed motions to suppress, challenging each step of the investigation: the Mississippi Nissan Sentra search, the Mississippi GPS Warrant, the South Carolina GPS Warrant, the Ping Warrants, the stop and search culminating in Appellant's arrest on October 6, 2019,[7] the delayed returns of the warrants, and the Government's alleged Wiretap Act violation.

On March 28 and 29, 2022, the district court held a suppression hearing on all of the motions. Following the hearing, the district court denied each of Appellant's motions to suppress. Relevant here, with respect to the Mississippi Nissan Sentra search, the district court assumed that Appellant had standing to challenge the stop and search of the Nissan Sentra on the car hauler. Then the court determined that it was reasonable for an officer to conclude that the driver of the car hauler validly consented to a search of the inside of the Nissan Sentra because a third party with actual or apparent authority may consent to "whatever was reasonable and not inconsistent with [the vehicle's] entrustment to him" and, in this case, "the driver of the car hauler was given the keys to the vehicle, the doors

_____

[7] Appellant initially contested the October 6, 2019 stop and search of his vehicle. However, Appellant does not renew his arguments on appeal.

were unlocked, and the driver was required to enter the vehicle at least for the purposes of driving the car on and off the hauler." J.A. 436–37 (quoting *United States v. Eldridge*, 302 F.2d 463, 466 (4th Cir. 1962)). However, with respect to the officers pulling up the carpet in the vehicle in order to discover whether the car had been modified with a floor trap, the district court determined that it was not reasonable for the officers to conclude that the driver could consent to the "invasive search into the upholstery, carpeting, and inner mechanics of the vehicle." *Id.* at 438.

Nevertheless, the district court determined that "the entire search, including the search under the carpeting, was supported by probable cause, and, therefore, fell within the automobile exception to the requirement for a search warrant." J.A. 438 (internal quotation marks omitted). The district court concluded that it was reasonable for Deputy Johnson to believe that evidence of drug trafficking would be located inside the vehicle given his many years of experience; the spottily painted undercoating; the tooling markings visible on the bolts on the underside of the vehicle; the bent heat shield; and, the apparent discrepancies on the bill of lading, including the post office box listed as the address of the car owner being different than the shipping address associated with the vehicle's listed sender. The district court concluded that Deputy Johnson's search under the carpet was further supported by probable cause based on the smell of fresh paint when he opened the car door, the additional tooling marks to the bolts securing the front seats, and the depth check indicating unaccounted for space, all of which indicated modifications had been made to install a floor trap in the vehicle. The district court therefore determined that the search

15

fell within the automobile exception because it was supported by probable cause, and the court denied Appellant's motion to suppress.

With respect to the Mississippi GPS Warrant, the district court held that it was reasonable for the Mississippi state court judge to determine that there was probable cause to support the GPS tracking warrant based on evidence obtained during the search of the Nissan Sentra, the K-9 alert to the presence of narcotics, the knowledge of the officer about drug trafficking operations, and Appellant's criminal history.

With respect to the South Carolina GPS Warrant, the district court held that probable cause existed to support the warrant. The district court highlighted that Agent Criswell's affidavit relayed the evidence from the Mississippi Nissan Sentra search, the evidence of the July 2018 USPIS package interception implicating Appellant, and Appellant's criminal history, all of which, along with Agent Criswell's extensive experience "supported the belief that the [Nissan] Sentra was involved in criminal activity." J.A. 451.

With respect to the late returns of the GPS and Ping Warrants, Appellant argued that the Government's noncompliance with timing requirements was prejudicial. Nevertheless, the district court determined that Appellant failed to make a showing of prejudice by failing to allege any particular prejudicial effect of the late returns. Further, the district court credited the testimony of the officers at the suppression hearing that the late returns of the warrants were unintentional.

As to the Ping Warrants in connection with TT-1, TT-2, and TT-3, the district court determined that the Ping Warrants were supported by probable cause because the affidavit attached to the application was sufficiently detailed regarding the investigation into the

16

target telephones and how they were being used to facilitate criminal activity. The district court further rejected Appellant's argument that the Government was required to adhere to the more stringent requirements of the Wiretap Act.

Thereafter, Appellant and the Government entered into a conditional plea agreement in which Appellant agreed to plead guilty to a drug trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(l), 841(b)(l)(A), 841(b)(l)(D), and 846 (Count One) and possession of a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c)(l)(A) (Count Nine). In relevant part, the parties agreed "that the Defendant maintains the right to appeal the Court's order entered at ECF Number 410 only as that order relates to Defendant's Motion to Suppress at ECF Number 350 (captioned "Wiretap Violation") and Defendant's Motion to Suppress at ECF Number 353 (captioned "South Carolina GPS Tracking Warrant")." J.A. 506. For its part, the Government agreed to dismiss the remaining counts of the indictment.

At sentencing, the district court reiterated to Appellant that he had entered into an appeal waiver and noted that Appellant had "carved out" two provisions from such waiver:

> THE COURT: Mr. Twitty, you signed a Plea Agreement, which we went over at the time of your guilty plea . . . in paragraph 13 of that Plea Agreement, you agreed to waive the right to contest your conviction or sentence in any direct appeal or other post-conviction action, including any proceedings under 28 U.S.C. Section 2255 . . . with the following items specifically preserved for appeal in your conditional guilty plea pursuant to Rule 11(a)(2). "[You] maintain the right to appeal the Court's Order entered at ECF number 410 only as that Order relates to your Motion to Suppress at ECF number [3]50 (sic), captioned 'wiretap violation.' And [your] Motion to Suppress at ECF number 353 captioned, 'South Carolina GPS tracking warrant.'" So, you have had an appellate waiver,

17

> which carved out that provision, but in other respects you have waived your right to appeal. . . . Do you understand all of that?
>
> [APPELLANT]: Yes, sir.

J.A. 569–71.

Appellant timely appealed.  On appeal, Appellant challenges the Mississippi Nissan Sentra search, the Mississippi GPS Warrant, the South Carolina GPS Warrant, the alleged Wiretap Act violation based on the Ping Warrants, as well as the late returns of the GPS and Ping Warrants.

## II.

We review an appellate waiver de novo to determine whether the waiver is enforceable.  *United States v. Smith*, 134 F.4th 248, 256 (4th Cir. 2025) (quoting *United States v. Boutcher*, 998 F.3d 603, 608 (4th Cir. 2021)).

When examining the denial of a motion to suppress, we review the district court's legal determinations de novo and its factual conclusions for clear error.  *United States v. Mayberry*, 125 F.4th 132, 143 (4th Cir. 2025).  In conducting this review, we evaluate the evidence in the light most favorable to the Government as the prevailing party in the district court.

## III.

### A.

### Appeal Waiver

We first address whether Appellant's arguments fall outside the scope of the appeal waiver.

18

The Government urges that we enforce the appeal waiver and consider only Appellant's arguments focused on the South Carolina GPS Warrant and the Wiretap Act. Appellant counters that the appeal waiver is inapplicable because the fruits of the Mississippi Nissan Sentra search, including Deputy Johnson's observations of the vehicle (i.e., the tooling to the bolts, spottily painted underside, the depth discrepancy, and the smell of fresh paint), the K-9 alert to the presence of narcotics, and the existence of the vehicle's floor traps were used to obtain the Mississippi GPS Warrant, and, subsequently, the South Carolina GPS Warrant were all considered by the district court as the basis for rejecting Appellant's motion to suppress the South Carolina GPS Warrant. Therefore, Appellant argues that both the Mississippi car search and Mississippi GPS Warrant are so intertwined with the South Carolina GPS Warrant that they must be considered on appeal. Appellant further urges that any ambiguity in the plea agreement should be construed against the Government as the drafter of the document.

"When we interpret plea agreements, we apply principles of contract law to ensure that each party receives the benefit of the bargain[.]" *United States v. Boutcher*, 998 F.3d 603, 608 (4th Cir. 2021) (citation and internal quotation marks omitted). And "[b]ecause appellate waiver provisions usually are drafted by the government, and because such provisions implicate a defendant's constitutional rights, we hold the government to a 'greater degree of responsibility' for any ambiguities than the defendant, or even than the drafter of a provision of a commercial contract." *United States v. Yooho Weon*, 722 F.3d 583, 588 (4th Cir. 2013) (citation omitted). "[W]e will enforce an appellate waiver provision against a defendant only if that provision is clearly and unambiguously

19

applicable to the issues raised by the defendant on appeal." *Id.* To determine whether a plea agreement is ambiguous, "courts examine the entire contract, considering particular words not as if isolated from the context, but in the light of the obligation as a whole. Form should not prevail over substance, and a sensible meaning of words should be sought." *United States v. Under Seal*, 902 F.3d 412, 419 (4th Cir. 2018) (citation omitted).

In relevant part, the appeal waiver states: "Pursuant to the terms of this plea agreement, the parties agree that the Defendant maintains the right to appeal the Court's [suppression] order . . . only as that order relates to Defendant's Motion to Suppress . . . []captioned 'Wiretap Violation'[] and Defendant's Motion to Suppress . . . []captioned 'South Carolina GPS [] Warrant'[]." J.A. 506.

Here, we cannot say that the language of the appeal waiver provision is "clearly and unambiguously applicable" to Appellant's arguments regarding the Mississippi Nissan Sentra search and the Mississippi GPS Warrant. *Yooho Weon*, 722 F.3d at 588. This is because the district court found the South Carolina GPS Warrant to be supported by probable cause based, in part, on both the Mississippi Nissan Sentra search and the Mississippi GPS Warrant. As a result, the merits of the South Carolina GPS Warrant's probable cause analysis on appeal are premised on the probable cause determinations of the Mississippi Nissan Sentra search and the Mississippi GPS Warrant. Therefore, because we necessarily must consider whether the Mississippi Nissan Sentra search and the Mississippi GPS Warrant were supported by probable cause in order to resolve the merits of Appellant's challenge to the South Carolina GPS Warrant, we hold that Appellant's

20

appeal falls outside the scope of the appeal waiver. A determination otherwise would allow "[f]orm . . . [to] prevail over substance." *Under Seal*, 902 F.3d at 419.

B.

Alleged Fourth Amendment Violations

1.

In this appeal, Appellant principally challenges the probable cause bases of multiple steps in the Government's investigation. First, Appellant argues that the Mississippi Nissan Sentra search was unsupported by probable cause, and, therefore, not lawful pursuant to the automobile exception. As a result, Appellant argues that the Mississippi GPS Warrant was also unsupported by probable cause because the fruits of the vehicle search were used to obtain the Mississippi GPS Warrant. Consequently, Appellant argues that the subsequent South Carolina GPS Warrant was also not supported by probable cause because it was founded on the initial Mississippi Nissan Sentra search and the Mississippi GPS Warrant.

The Government counters that the Mississippi Nissan Sentra search falls within the automobile exception because Officer Johnson had probable cause for the vehicle search. The Government further argues that the Mississippi GPS Warrant was supported by probable cause, and, thus, the South Carolina GPS Warrant was likewise supported by probable cause. Alternatively, the Government asserts that even if the South Carolina GPS warrant was not supported by probable cause, the officers relied in objective good faith on the South Carolina GPS Warrant, so the evidence should not be suppressed.

21

2.

The Fourth Amendment protects individuals against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A 'search' occurs for purposes of the Fourth Amendment where the government violates a person's 'reasonable expectation of privacy.'"  *United States v. Taylor*, 54 F.4th 795, 803 (4th Cir. 2022) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (citation omitted)).  Generally, government agents cannot execute a search without first obtaining a warrant based on "probable cause."  U.S. Const. amend IV.  The installation and monitoring of a GPS trafficking device is a search within the meaning of the Fourth Amendment.  *United States v. Jones*, 565 U.S. 400, 404 (2012).

"A finding of probable cause does not require an actual showing of criminal activity."  *United States v. Mayberry*, 125 F.4th 132, 143 (4th Cir. 2025) (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).  "Instead, 'a fair probability' 'or substantial chance of criminal activity' is sufficient to establish probable cause."  *Id.* at 143 (quoting *Gates*, 462 U.S. at 238, 243 n.13) (citation omitted).

A probable cause assessment by a magistrate judge involves making "'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . , there is a fair probability that contraband or evidence of a crime will be found.'"  *United States v. McNeal,* 818 F.3d 141, 150 (4th Cir. 2016) (quoting *Gates,* 462 U.S. at 238).  As a reviewing court, we are obliged to accord "great deference" to the magistrate's assessment of the facts presented, "asking only whether the judicial officer had a substantial basis for finding probable cause."  *United States v. Blakeney*, 949 F.3d

22

851, 859 (4th Cir. 2020) (citation and internal quotation marks omitted). Even if a search warrant is later determined to lack probable cause, the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith. *See id.* (citing *Leon*, 468 U.S. at 922–23).

3.

a.

Mississippi Nissan Sentra Search

We begin with the question of whether probable cause existed to justify the Mississippi Nissan Sentra search pursuant to the automobile exception.

i.

Expectation of Privacy

The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place." *United States v. Castellanos*, 716 F.3d 828, 833 (4th Cir. 2013) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). The expectation of privacy must be "'objectively reasonable.'" *United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021) (quoting *Castellanos*, 716 F.3d at 832 & n.3). A defendant bears the burden of showing that he possesses a reasonable expectation of privacy. *See id.*

In determining whether Appellant possessed a reasonable expectation of privacy in the Nissan Sentra, the district court distinguished *United States v. Castellanos*, where we determined that the defendant did not have a reasonable expectation of privacy in a vehicle being shipped across the country on a car hauler. The district court highlighted that the

23

defendant in *Castellanos* was not associated with the vehicle's shipment "in any way." J.A. 431 (citing 716 F.3d at 833). As the district court stated, the instant situation is different because Appellant's name "*was* listed as the recipient of the vehicle in question . . . [and] [t]he bill of lading specifically indicated that he would receive the vehicle and pay cash for it upon receipt in Greenville, South Carolina." *Id.* (emphasis in original). The court then assumed that Appellant had standing to challenge the search, reasoning that "[i]t would be hypertechnical to assert that the products of the search, i.e., the existence of various aftermarket compartments, can be used against [Appellant] personally in obtaining various subsequent warrants and in his ultimate prosecution, but that he has no authority to challenge the underlying initial search." J.A. 435. For the purposes of this appeal, we assume without deciding that Appellant had a reasonable expectation of privacy and, therefore, standing, to challenge the Mississippi Nissan Sentra search. *See e.g., City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010) (assuming arguendo that a reasonable expectation of privacy existed).

ii.

Consent

Next, the district court viewed the initial search of the vehicle, up until the officers pulled up the carpet, as justified by the car hauler driver's valid consent. The court acknowledged that, although the driver could consent to looking around inside the vehicle, the driver would not have been able to consent to a more invasive search because "in entrusting the vehicle to the driver for shipment, whomever handed over the keys did not envision such entrustment to reasonably include the ability to rip up the flooring or

24

upholstery." J.A. 437 (citing *United States v. Eldridge*, 302 F.2d 463, 466 (4th Cir. 1962)). We agree that the initial search inside the vehicle was based upon the valid consent of the driver. But it is enough to simply assume that the driver could not consent to the more invasive search under the carpet because that search was supported by the multiple bases for probable cause.

### iii.

### Probable Cause

The Fourth Amendment requires law enforcement officers to "secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (citing *California v. Carney*, 471 U.S. 386, 390–391 (1985)). However, one of the well established exceptions to this requirement is the automobile exception, which justifies warrantless searches of vehicles without a "separate exigency requirement." *Id.* at 467. The automobile exception is premised on the two justifications of mobility and the reduced expectation of privacy that owners have in vehicles because vehicles on the road are heavily regulated. *See United States v. Kelly*, 592 F.3d 586, 590 (4th Cir. 2010) ("There are two justifications for the automobile exception. . . . 'Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.'") (first quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976); and then citing *Carney*, 471 U.S. at 392 ("[T]he pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of

25

probable cause is met."))).  Therefore, pursuant to the automobile exception, probable cause to believe that a vehicle contains contraband justifies "a warrantless search." *United States v. Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021).  This is so "*even though a warrant has not been actually obtained*." *Dyson*, 527 U.S. at 467 (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982)).  And "where the automobile exception applies, 'it justifies the search of every part of the vehicle.'"  *Caldwell*, 7 F.4th at 200 (quoting *Ross*, 456 U.S. at 825).

In *Chambers v. Maroney*, the Supreme Court outlined the rationale for the automobile exception as mobility because "the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.  Hence an immediate search is constitutionally permissible." 399 U.S. 42, 51 (1970).  The Court reasoned that "[f]or constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant[, so] [g]iven probable cause to search, either course is reasonable under the Fourth Amendment." *Id.* at 52.

Although initially premised only on ready mobility, in subsequent cases, the Supreme Court highlighted an additional justification for the automobile exception: that individuals experience a "reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (citing *Carney*, 471 U.S. at 391–92).  In *Collins v. Virginia*, 584 U.S. 586, 591 (2018), the Court again acknowledged that, in addition to ready mobility, which is the "core justification," the

26

automobile exception is also premised on the pervasive regulation that vehicles already face while on the roads. *Id*.

The district court determined that the search was justified by the automobile exception because probable cause supported the "the entire search, including the search under the carpeting" and opening the floor traps to search inside. J.A. 438. The court reasoned that Deputy Johnson's observations of the Nissan Sentra, the bill of lading, and the car's registration established probable cause to allow Deputy Johnson to search the inside of the vehicle. The court concluded that Officer Johnson's search under the carpet was further supported by probable cause that the vehicle was associated with drug trafficking activity based on the smell of fresh paint when he opened the car door, the additional tooling to the bolts securing the front seats, and the depth check indicating unaccounted for space, which all indicated modifications had been made to install a floor trap in the vehicle.

Here, Deputy Johnson knew, based on his visual inspection of the underside of the car, that the undercoating of the Nissan Sentra had a patchy paint job, a bent heat shield, and tooling marks to the bolts, all of which indicated to him that the car had been modified to include a floor trap. Further, there were discrepancies on the bill of lading for the Nissan Sentra, including that there were three people involved rather than merely the sender and receiver of the vehicle, that the phone numbers associated with the sender and receiver were both California phone numbers even though the car was being shipped to South Carolina, and that the car was registered to the sender at a post office box address, which was a different address than the shipping address associated with the vehicle's sender listed

27

on the bill of lading.  Bolstering these observations was Deputy Johnson's 23 years of experience: "I know that [Nissan Sentras are] . . . commonly used . . . [to install] floor trap[s] by drug trafficking organizations. I have seen that many occasions, that is a common vehicle."  J.A. 161.  Therefore, to an objectively reasonable police officer, these facts reflected "'a fair probability' 'or substantial chance [that evidence of drug trafficking would be discovered in the vehicle].'"  *Mayberry*, 125 F.4th at 143 (quoting *Gates*, 462 U.S. at 238, 243 n.13).  Therefore, the search of the car was justified by the automobile exception.

Moreover, Deputy Johnson's more thorough search of the vehicle by pulling up the carpet, lifting up the seats, and opening the floor traps was likewise justified by probable cause, including the smell of fresh paint that Deputy Johnson encountered when he opened the car door, the additional tooling marks that he witnessed on the driver and passenger seat bolts, and the depth check that he conducted, which all indicated to him that a floor trap had been installed.  These indications were further supported by the K-9 alert to the presence of narcotics, which we have acknowledged is sufficient to establish probable cause.  *See United States v. Green*, 740 F.3d 275, 283 (4th Cir. 2014) (concluding that a positive dog sniff established probable cause to search a vehicle during a traffic stop).

Accordingly, because these facts provided a basis for Deputy Johnson to conclude that there was a probability that evidence of drug trafficking would be discovered in the vehicle, we conclude that the search of the vehicle was supported by probable cause, and therefore, justified by the automobile exception.

b.

Mississippi GPS Warrant

Appellant argues that the Mississippi GPS warrant is unsupported by probable cause because the foundation for such warrant is the allegedly illegal search of the Nissan Sentra.

With respect to the Mississippi GPS Warrant, the district court determined that it was reasonable for the Mississippi state court judge to conclude that there was probable cause for the GPS warrant based on evidence obtained during the search of the Nissan Sentra, including the floor trap and the positive K-9 alert to the presence of narcotics; Agent Cooley's knowledge that "drug traffickers and bulk cash money couriers are utilizing car haulers" to "allow them to distance themselves from the vehicles"; and Appellant's criminal history.  J.A. 442.

Because we have already determined that the search of the Nissan Sentra was supported by probable cause, and because we agree that the Mississippi magistrate judge had a substantial basis for finding probable cause, we conclude that the Mississippi GPS warrant was likewise valid.

c.

South Carolina GPS Warrant

i.

Staleness

Appellant relies on *United States v. Doyle*, to argue that the Government should not have been able to use eight month old evidence of Appellant's drug trafficking -- that is,

29

the July 2018 package interception -- to support the probable cause basis for the South Carolina GPS Warrant.  650 F.3d 460, 474 (4th Cir. 2011).

We agree that probable cause includes a temporal requirement.  "A valid search warrant may issue only upon allegations of 'facts so closely related to the time of issue of the warrant as to justify a finding of probable cause at that time[, and] [w]hether the proof meets this test must be determined by the circumstances of each case.'"  *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999), *opinion vacated in part on other grounds on reh'g en banc*, 218 F.3d 310 (4th Cir. 2000), and *on reh'g in part,* 218 F.3d 310 (4th Cir. 2000) (quoting *Sgro v. United States*, 287 U.S. 206, 210–11 (1932)).  But "the existence of probable cause cannot be determined 'by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'"  *United States v. Richardson*, 607 F.3d 357, 370 (4th Cir. 2010) (quoting *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) (citation omitted)).  Rather, we must "look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized."  *Id.* (quoting *McCall*, 740 F.2d at 1336).  "[P]robable cause [may] . . . exist despite substantial gaps between the observation of the evidence . . . and the issuance of a search warrant."  *McCall*, 740 F.2d at 1336.

Therefore, time is only one consideration.  And where, as here, the alleged criminal activity is continuing in nature, that single factor may be overcome by other considerations.  In *United States v. Rhynes*, we determined that two year old money laundering activity related to drug trafficking activity was not stale enough to suppress because the drug

30

operation was a long term venture.  196 F.3d  at 234.  *See also United States v. Zayas-Diaz*, 95 F.3d 105, 116 (1st Cir. 1996) (concluding that evidence of drug trafficking may remain in a location for weeks or months at a time).  Likewise, in *United States v. Farmer*, in the context of a nine month span of time between alleged criminal activity and the issuance of a warrant based on that activity, we held that "criminal activities of a protracted and continuous nature" or "ongoing" activities "suggested that probable cause was not diminished solely by the passage of time."  370 F.3d 435, 439 (4th Cir. 2004) (cleaned up).

Appellant argues that by the time the Government utilized evidence relating to the July 2018 USPIS package interception to support probable cause for obtaining the South Carolina GPS Warrant in March 2019, the evidence was too stale.  But this argument seeks to merely count "the number of days between the occurrence of the facts supplied and the issuance of the affidavit" as a means to challenge the validity of the South Carolina GPS Warrant.  *McCall*, 740 F.2d at 1336.

The Government responds that the 2018 USPIS investigation was not stale because it was unlikely that Appellant had abandoned his drug trafficking activities between July 2018 and March 2019.  This was so, according to the Government, because drug trafficking is an "ongoing enterprise rather than an isolated incident."  Gov't's Resp. Br. at 23 (first citing *United States v. Bosyk*, 933 F.3d 319, 330 (4th Cir. 2019) (finding that courts have sustained warrants "issued many months, and even years after the events that gave rise to probable cause" in child pornography cases); then citing *Farmer*, 370 F.3d at 439–40; and then citing *Rhynes*, 196 F.3d at 234).

31

Here, the facts and circumstances do not support finding the evidence from the package intercepted in July 2018 as too stale to be used to support the existence of probable cause for the South Carolina GPS Warrant in March 2019. The alleged criminal activity was a drug operation, which we have acknowledged is an ongoing enterprise. *See Rhynes*, 218 F.3d at 310. And, unlike in *Doyle*, where there was "no indication as to when the events supposedly creating probable cause to search took place," here, the affidavit submitted in support of the South Carolina GPS Warrant stated that the contested interception of the package occurred in July 2018, eight months prior to March 2019, when the Government applied for the South Carolina GPS warrant. 650 F.3d at 474. Therefore, we hold that in an ongoing criminal enterprise of drug trafficking, the use of eight month old evidence in support of a warrant does not require suppression.

ii.

Probable Cause

Appellant next challenges the South Carolina GPS warrant as unsupported by probable cause. Appellant's argument is based upon his challenges to the probable cause bases for the earlier Mississippi Nissan Sentra search and the Mississippi GPS Warrant. Appellant reasons that the South Carolina GPS Warrant is invalid as fruit of the poisonous tree because it was based, in part, on the allegedly unlawful Mississippi Nissan Sentra search and the Mississippi GPS Warrant. Therefore, Appellant argues that even if the evidence from the July 2018 investigation is not stale, it is insufficient alone to support a finding of probable cause.

32

Here, the district court did not err in determining that the South Carolina GPS Warrant was supported by probable cause. We have already determined that the Mississippi Nissan search was supported by probable cause, that there was a substantial basis to support the Mississippi GPS Warrant, and that the use of the eight month old evidence does not warrant suppression. Therefore, we affirm the district court's determination that the South Carolina GPS Warrant was supported by probable cause.[8]

d.

Ping Warrants

Appellant argues that the district court erred in failing to suppress the Ping Warrants as fruit of the poisonous tree because they are "derivative of" the allegedly unconstitutional South Carolina GPS Warrant, and because the warrants are "so closely intertwined" that finding the South Carolina GPS Warrant invalid would require our invalidation of the Ping Warrants as well. Appellant's Opening Br. at 51. Appellant also argues that the Ping Warrants were not sufficiently supported by indicators of probable cause. Yet, Appellant's brief contradicts his own argument by acknowledging that the affidavits supporting the Ping Warrants "detail[] the investigators['] tracking of the [Nissan Sentra] and subsequent physical surveillance of [Appellant] and [his alleged co-conspirator girlfriend]." *Id.* at 51.

---

[8] The Government urges that, even if the warrant were unsupported by probable cause, suppression would be inappropriate pursuant to the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 920–23 (1984). However, because we determine that the South Carolina GPS warrant was valid, we need not address the good faith exception.

33

Nevertheless, the record makes clear that in addition to information derived from the South Carolina GPS Warrant, the Ping Warrants were supported by extensive evidence of monitoring by the USPIS of the packages being sent to and from Appellant's known addresses, physical monitoring of the movements of Appellant and his co-conspirator girlfriend, physical monitoring of the packages the pair sent, interception of additional packages and the contents thereof, and analysis of Appellant's historical flight data.

Because we have already confirmed the validity of the South Carolina GPS Warrant, we need not address Appellant's fruit of the poisonous tree argument further.

Therefore, we hold that the Ping warrants were supported by probable cause, as evidenced by the extensive evidence outlined in each warrant application.

## C.

### Wiretap Act

Pursuant to the Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*, wire and oral communications are subject to statutory suppression when the communications are obtained in a manner "except as specifically provided for in the statute." 18 U.S.C. §§ 2511, 2518(10)(a) ("Any aggrieved person . . . may move to suppress the contents of any wire or oral communication. . . . "). In *United States v. Smith*, we acknowledged the so-called "necessity requirement," which requires the Government to "establish the need for a wiretap by showing *either* (i) that normal investigative procedures have been tried and failed, *or* (ii) that normal investigative procedures, though not yet tried, reasonably appear to be either unlikely to succeed if tried or too dangerous." 31 F.3d 1294, 1298 n.2

(4th Cir. 1994) (citation and internal quotation marks omitted) (emphases in original) (citing 18 U.S.C. §§ 2518(1)(c) and (3)(c)).

Appellant argues that the district court erred in failing to treat the Ping Warrants as a Wiretap Act violation "because the great invasion of privacy that results from a . . . [P]ing [W]arrant is akin to that of a wiretap." Appellant's Opening Br. at 44. Appellant urges that we should impose the Wiretap Act's necessity requirement here and suppress the evidence derived from the Ping Warrants based upon the Government's failure to comply with such requirement. The Government responds that no wiretap actually occurred in this case since "[t]he GPS warrants and [Ping Warrants] provided agents geo-location data for the Nissan Sentra and for the target telephones—not content information." Gov't's Resp. Br. at 34. Therefore, the Government argues that the Wiretap Act does not apply in this case.

The district court determined that the Wiretap Act did not apply because the "*contents*" of Appellant's wire communications were not "intercepted." J.A. 495–96 (emphasis supplied). Additionally, the district court declined Appellant's request to construe the Wiretap Act to apply simply due to the "real-time" nature of the tracking absent any authority in support of such a construction. *Id.* at 496–97. Indeed, at the suppression hearing, Appellant candidly acknowledged that "there is no case" to support his position. J.A. 376.

The district court further concluded that Appellant's arguments were "unavailing" inasmuch as the Supreme Court in *Carpenter v. United States* "clearly recognized the same considerations." J.A. 461, 497 (quoting *Carpenter v. United States*, 585 U.S. 296, 311–13

35

(2018)).   That is, *Carpenter* acknowledged "'time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations'" and "'achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.'"   *Id.* (quoting *Carpenter*, 585 U.S. at 311–12).   Yet, the Court in *Carpenter* "determined that only probable cause was required to support a warrant" authorizing the acquisition of historical cell site data.   *Id.* (quoting *Carpenter*, 585 U.S. at 316).

On appeal, Appellant cites two cases in which improperly intercepted communications were suppressed.   *See* Appellant's Opening Br. at 45–47 (first citing *United States v. Giordano*, 416 U.S. 505, 509 (1974); and then citing *United States v. Rice*, 478 F.3d 704, 706 (6th Cir. 2007)).   However, unlike in the cases cited by Appellant, here, no *communications* were intercepted.   And that makes all the difference.

The district court did not err in determining that the Wiretap Act did not apply in Appellant's case.   The Ping Warrants did not authorize a search of the contents of Appellant's communications.   They authorized only the acquisition of GPS data and the acquisition of real time tracking data.   As the district court correctly observed, GPS data is neither a wire nor oral communication.   Therefore, the Wiretap Act is inapplicable.   *See e.g.*, *United States v. Barajas*, 710 F.3d 1102, 1110 n.5 (10th Cir. 2013) ("GPS data is neither a wire nor oral communication, thus Title III-suppression [pursuant to the Wiretap Act] does not apply.").

36

The Wiretap Act does not apply to the Ping Warrants because "contents" of Appellant's wire communications were not "intercepted."   18 U.S.C. § 2518(10)(a). Therefore, we affirm the district court.

D.

Rule 41 Violations

Finally, we consider whether the Government's repeated failures to return warrants in a timely manner requires suppression.

Federal Rule of Criminal Procedure 41(f)(2)(B) states, "[w]ithin 10 days after the use of the tracking device has ended, the officer executing the warrant must return it to the judge designated in the warrant."   Fed. R. Crim. P. 41(f)(2)(B).   Here, the returns all occurred well after the allotted time.   The Mississippi GPS Warrant return was not made until "some time later but not within the ordered time frame."   J.A. 444.   The South Carolina GPS Warrant return was not made until January 21, 2020, nine months after it was due.   And the Ping Warrant returns regarding the tracking authorized on March 21, 2019, (TT-1), August 29, 2019, and September 27, 2019, (TT-2), and September 9, 2019, (TT-3), were not made until January 28 and 29, 2021, well over a year past due.

Appellant argues that the late filed returns for the South Carolina GPS Warrant and the Ping Warrants merit suppression.   Appellant reiterates the same argument on appeal as he made below, that the "lackadaisical record keeping" on the part of the Government prejudiced Appellant, and, therefore, required suppression.   Appellant's Opening Br. at 43. The Government counters that we should affirm the district court's determination that

37

suppression was not required because Appellant fails to demonstrate any prejudice by the late returns.

Regarding the late filed returns for the South Carolina GPS warrant and the Ping Warrants, the district court noted Appellant's argument that the lateness "prejudiced him and [was] the direct result of deliberate disregard of the Rule by the government." J.A. 465, 471–72, 474. However, the district court highlighted that Appellant's argument was devoid of any specific explanation as to how he was prejudiced or why he believed that the Government acted deliberately and intentionally in filing the late returns. The district court reiterated, with respect to each warrant, that it credited the officers' testimony that their failure to timely file the returns was merely due to administrative oversight. Therefore, the district court held that, although it "understands and appreciates the frustration of counsel in the timing of the return[s], absent a particularized showing of prejudice to the defendant, it would be nonsensical for the court to order suppression of . . . warrant[s] . . . supported by probable cause solely based on [] non-constitutional violation[s] regarding the timeliness of the filing of general return[s]." J.A. 456, 465, 480. And the district court determined that Appellant experienced no discovery related prejudice because Appellant failed to allege a particularized showing of prejudice and because Appellant's counsel in fact received the warrant returns as evidence prior to the time trial was scheduled. In reaching this conclusion, the district court analogized to the *Brady v. Maryland* context, which, unlike ministerial Rule 41 violations, does implicate a defendant's constitutional rights and requires the disclosure of evidence before trial, which was done here.

38

In *United States v. Simons*, we acknowledged "two categories of Rule 41 violations: those involving constitutional violations, and all others," including ministerial violations. 206 F.3d 392, 403 (4th Cir. 2000) (citing *United States v. Smith*, 914 F.2d 565, 568 (4th Cir. 1990) (labeling as "ministerial" appellant's claimed error that the government had not returned the warrant to the magistrate judge but determining that suppression was not warranted because appellant failed to demonstrate prejudice)). "Non-constitutional violations of Rule 41 warrant suppression only when the defendant is prejudiced by the violation, *see Smith*, 914 F.2d at 568; [*United States v. Wyder*, 674 F.2d 224, 226 (4th Cir. 1982)], or when there is evidence of intentional and deliberate disregard of a provision in the Rule[.]" *Simons*, 206 F.3d at 403.(citations and internal quotation marks omitted).

Because Appellant makes only a conclusory allegation that he was prejudiced on appeal without any showing of actual prejudice, we affirm the district court. Appellant experienced no discovery related prejudice because his counsel received the relevant information prior to trial.

That being said, we are dismayed by the Government's utter and repeated disregard for the procedural requirements of Rule 41. The Government failed to file a timely warrant return not once but five times. And the delays were not just a matter of days. Under some circumstances, one might wonder whether so many extensive delays are merely an "administrative oversight." J.A. 452, 465, 471–72, 474, 479 (acknowledging that the agent testified that the late returns were due to administrative oversight).

Nonetheless, we are constrained to affirm the district court's holding that Appellant failed to establish an intentional and deliberate disregard for Rule 41, given that it is

39

undergirded by credibility findings in favor of the officers' testimony that the late filed returns were the product of administrative oversight. *See generally* J.A. 452, 457, 459, 465, 472, 474, 479 (finding the testimony to be credible). But, even taking the Government at its word, this case reveals substantial carelessness on the part of the Government. We expect better.

## IV.

For the foregoing reasons, we affirm the ruling of the district court.

*AFFIRMED*

40

THACKER, Circuit Judge, concurring:

I write separately to note my discomfort with the automobile exception in general and as applied in this case, in particular. The legal fiction inherent in the application of the automobile exception is particularly diminished in this case. According to its "core" underlying justification, the automobile exception serves as a solution to the exigency of occupants being alerted and cars being readily mobile. The exception aims to avoid the loss of evidence. However, in this case, the car was not being driven, no occupant or owner was alerted, and no evidence was at risk of being lost by a slight delay in obtaining a warrant. In fact, the record supports the opposite conclusion. The driver of the car hauler waited while the vehicle was searched on the side of the road, transported the vehicle to the law enforcement automobile shop, removed it from the car hauler for a more thorough search, and waited for law enforcement to obtain and install the Mississippi GPS Warrant before loading the car back onto the car hauler and continuing to South Carolina.

Yet, according to the applicable precedent, these critical facts are not important. It matters not whether a vehicle is actually in use "on the highways"; rather, a vehicle need only be "readily capable of such use rather than, say, elevated on blocks." *United States v. Davis*, 997 F.3d 191, 201 n.8 (4th Cir. 2021) (cleaned up) (quoting *California v. Carney*, 471 U.S. 386, 392–93, 394 n.3 (1985)).

Nor is the presence of the occupant or owner of a vehicle a requirement for the automobile exception to apply. Supreme Court precedent, as well as our own, dictate that a later in time warrantless search that occurs after a vehicle has been immobilized or impounded -- that is, even though the occupants were not present to move the vehicle -- is

41

permissible so long as the search is still justified by probable cause. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (upholding a roadside vehicle inventory search where the driver was no longer present pursuant to the automobile exception); *Florida v. Meyers*, 466 U.S. 380, 382 (1984) (upholding a warrantless search of a vehicle that occurred eight hours after the initial roadside search and after "the element of mobility was removed" because the automobile had been impounded). *See also United States v. Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021) (upholding -- pursuant to the automobile exception -- the search of a vehicle thirteen days after impoundment where the vehicle needed to be jump started to access the trunk); *United States v. Gastiaburo*, 16 F.3d 582, 586 (4th Cir. 1994) (stating "the fact that impoundment may have made it virtually impossible for anyone to drive the car away or to tamper with its contents is irrelevant to the constitutionality of a warrantless search"). The Supreme Court has held "the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Michigan*, 458 U.S. at 261.

Moreover, the Supreme Court has established, and we have acknowledged, that the automobile exception is also partially premised upon pervasive regulation of vehicles, allowing for "less rigorous warrant requirements [to] govern [vehicles] because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Kelly*, 592 F.3d at 590 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)). In my view, such a broad justification pushes us

over any slippery slope of privacy protection and right into the ditch, serving only to strip away from all persons travelling in vehicles on roads the "require[ment that] the police [] obtain a warrant before conducting a search." *Id.* The result of this broadly applied legal fiction is that officers presumably need not ever apply for warrants to search vehicles so long as probable cause exists. As evidenced by the present case, the legal fiction of this overbroad construction of the automobile exception "provide[s] [] police entitlement [to search], [even though] it is anathema to the Fourth Amendment to permit a warrantless search on th[e]" basis of police entitlement. *Arizona v. Gant*, 556 U.S. 332, 347 (2009); *United States v. Davis*, 997 F.3d 191, 202–03 (4th Cir. 2021) (recognizing the same).

It is apparent that -- although the rule was originally rooted in the justifications of occupants being alerted combined with the ready mobility of vehicles, which could result in a loss of evidence as well as the pervasive regulation of vehicles -- the automobile exception has since become unrooted from these justifications. We have recognized as much. *See Caldwell*, 7 F.4th at 201 n.6 (4th Cir. 2021) (noting that *Gant*, 556 U.S. at 346–47, "narrowed certain exceptions to the warrant requirement in order to keep the exceptions rooted in their justifications[,] . . . [so i]t is therefore [also] conceivable that the Supreme Court could someday limit the current reach of the automobile exception."). I hope so. In the meantime, "[w]e must simply apply [the Supreme Court's] commands" because "it remains the Supreme Court's 'prerogative alone to overrule one of its precedents.'" *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)).